UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1)  AHMAD "ANDY" KHAWAJA,<br>(2)  MOHAMMED "MOE" DIAB,<br>(3)  AMY RINGLER ROUNTREE, and<br>(4)  THOMAS WELLS,<br><br>Defendants. | 21cr10250<br><br>Violations:<br><br>Count One:   Conspiracy to Commit Wire Fraud<br>(18 U.S.C. § 1349)<br><br>Count Two:   Conspiracy to Commit Bank Fraud<br>(18 U.S.C. § 1349)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.     Allied Wallet, Inc. ("Allied Wallet") was a payment processing company headquartered in Los Angeles, California that served merchants doing business over the internet. Allied Wallet obtained for its merchant clients access to banking and related services that enabled them to accept debit and credit card payments over global electronic payment networks run by Visa, Mastercard, American Express, and Discover, among others (the "Card Brands"). Allied Wallet served as an intermediary between its merchant clients and financial institutions that were members of the Card Brand Networks ("Acquirers" or "Acquiring Banks").

2.     Defendant AHMAD "ANDY" KHAWAJA was a resident of Los Angeles, California and the owner and Chief Executive Officer of Allied Wallet.

3.     Defendant MOHAMMED "MOE" DIAB was a resident of Glendale, California and the Chief Operating Officer of Allied Wallet.

1

4.      Defendant AMY ROUNTREE, nee RINGLER, was a resident of Logan, Utah and the Vice President of Operations of Allied Wallet.

5.      Defendant THOMAS WELLS was a resident of Martin County, Florida and the owner of Priority Payout, a Florida corporation.    Priority Payout served as an independent sales organization (also known as a "reseller") for Allied Wallet, referring merchant clients to Allied Wallet for payment processing services.

6.      Payvision and Wirecard AG, based in the Netherlands and Germany, respectively, were Acquirers with which Allied Wallet contracted to obtain payment card processing and related services for Allied Wallet's merchant clients.

7.      Reseller 1 was a resident of Sweden.    Reseller 1 represented online gaming businesses seeking payment card processing through Allied Wallet.

8.      Rudy Dekermenjian was a resident of Glendale, California and provided legal and other services to Allied Wallet.    Allied Wallet referred to Dekermenjian as its General Counsel.

9.      Fifth Third Bank was a bank with headquarters in Cincinnati, Ohio and financial institution within the meaning of Title 18, United States Code, Section 20.

10.      Vantiv, Inc. was an Acquirer based in Cincinnati, Ohio.    Beginning in or about October 2013, Allied Wallet contracted with a Vantiv agent in Lowell, Massachusetts to obtain payment card processing and related services for Allied Wallet's merchant clients.    Vantiv settled merchant processing transactions with Allied Wallet through an account at Fifth Third Bank.

11.      Merchant Client 1 was a student debt consolidation business based in Los Angeles, California that obtained payment card processing through Allied Wallet and Vantiv,

2

among other Acquirers.

*Background Concerning Payment Card Processing*

12.     For most credit and debit card transactions, there were at least five essential participants: a consumer, a merchant, an Issuing Bank, an Acquirer, and a Card Brand.

        a.     The Card Brands ran global electronic payment networks ("Card Brand Networks") that permitted processing and settlement of payment card transactions.

        b.     A bank that issued credit or debit cards to consumers was referred to as an "Issuing Bank" or "Issuer."

        c.     In order to accept credit and debit card payments from consumers, merchants established payment card processing accounts with Acquirers.

13.     While some merchants contracted directly with Acquirers to obtain payment card processing services, other merchants gained access to the Card Brand Networks through intermediaries—including payment processors, payment facilitators, Independent Sales Organizations ("ISOs"), and resellers (collectively "Service Providers").

        a.     Payment Facilitators generally recruited merchants, obtained and submitted merchant applications to Acquirers, and provided merchants with the technical capabilities to accept and process payment card transactions.   Payment Facilitators also sometimes obtained access to accounts with Acquirers through which they processed and settled transactions for their merchant clients.   Merchants that Payment Facilitators recruited and processed in this way were known as "Submerchants."

        b.     ISOs recruited merchants on behalf of Acquirers and Payment Facilitators but did not generally provide processing or settlement services for payment card transactions.

14.     For their respective roles in providing payment processing services, merchants paid the Card Brands, Issuers, Acquirers, and Service Providers percentages of the value of payment card transactions and associated fees.

15.     Every transaction processed through the Card Brand Networks included detailed information regarding the transaction, including, among other things:

      a.     the name of the merchant;

      b.     the location of the merchant;

      c.     a merchant-specific identification number, known as a "MID";

      d.     a "Billing Descriptor," which was a short line of text that typically contained a merchant's name (or a variant of it) and a phone number.    Billing Descriptors ultimately appeared on credit or debit card billing statements issued to consumers; and

      e.     a Merchant Category Code ("MCC"), which was a four-digit code that Card Brands, Issuers, Acquirers, and Service Providers used to distinguish among different types of transactions.    Gambling transactions, for example, were classified with the MCC "7995," whereas transactions for "miscellaneous general merchandise" were classified with the MCC "5399."

16.     Issuers, Acquirers and Service Providers routinely relied on MCCs to block payment processing for certain categories of transactions, such as MCC 7995 online gambling transactions, either because the jurisdictions in which they operated prohibited them or because the Issuers, Acquirers and Service Providers did not want to accept the financial or regulatory risk involved with processing such transactions.    Issuers, Card Brands, Acquirers, and Service Providers, for these and other reasons, relied on the accuracy of MCCs and other information

4

related to the transactions.

17.     A "chargeback" occurred when a consumer disputed a charge as unauthorized or fraudulent, among other reasons.

*Payment Processing Rules*

18.     Each Card Brand issued rules to protect consumers, to comply with anti-money laundering statutes, to reduce the financial risks associated with chargebacks and fraud, and to preserve the integrity of the payment system (together "the Card Brand Rules").

19.     The Card Brand Rules, among other things:

    a.     Prohibited transactions that were illegal under laws applicable to any of the parties involved in the transaction; and

    b.     Required the provision of accurate information regarding the merchant's identity, location, and MCC.

20.     The Card Brand Rules also obligated Acquirers to ensure that Service Providers sending merchant transactions through the Card Brand Networks followed the Card Brand Rules.

21.     Contracts between and among Acquirers, Services Providers, and Merchants typically required compliance with both the Card Brand Rules and other terms that the Acquirers or Service Providers imposed.

22.     Acquirers and Service Providers, for example, often prohibited providing processing services not only for unlawful transactions, but also for transactions that carried a high risk of chargebacks or fraud ("High Risk Transactions"), such as those involving payday lending and debt reduction services, online gambling, and prescription drug sales (in jurisdictions that did not already prohibit them by law).    The willingness of an Acquirer or Service Provider

to process High Risk Transactions often depended on their tolerance for the financial and regulatory risks associated with such transactions.   Acquirers required Service Providers to provide accurate information about prospective merchants to determine whether to process the merchants' transactions.

23.     Once merchants obtained access to the Card Brand Networks, the Card Brand Rules required Acquirers and Service Providers to monitor the merchants' sales transactions for atypical processing volumes, excessive chargebacks or fraud, and other indications of prohibited transactions.

24.     Chargebacks and prohibited transactions exposed merchants, Service Providers, and Acquirers to the risk of lost revenue, fines, and suspension or termination from the Card Brand Networks.

## **Overview of the Wire Fraud Conspiracy**

25.     KHAWAJA, DIAB, ROUNTREE, WELLS, Reseller 1, and coconspirators known and unknown to the grand jury agreed to engage in a scheme to defraud several Acquirers, Issuers, Service Providers, and Card Brands of money and property by fraudulently inducing them to provide payment processing services to merchants (i) engaged in prohibited or High Risk Transactions and (ii) that were terminated for fraud, chargeback, or other compliance concerns, by knowingly misrepresenting the types of transactions the merchants were processing and the true identities of the merchants.   Through the scheme, the defendants and their co-conspirators fraudulently obtained more than $150 million in payment card processing through more than 100 sham merchants.

**Object and Purpose of the Wire Fraud Conspiracy**

26.     The object of the conspiracy was to commit wire fraud.    The principal purposes of the conspiracy included, among others, the following:

   a. To obtain payment processing services that Acquirers and Service Providers would otherwise have refused to provide, including the provision of merchant bank accounts and the payment of money to settle payment card transactions; and

   b. To obtain money, in the form of commissions earned based on the total value of payment card transactions processed and other fees.

**Manner and Means of the Wire Fraud Conspiracy**

27.     Among the manner and means by which KHAWAJA, DIAB, ROUNTREE, WELLS, Reseller 1, and coconspirators known and unknown to the grand jury carried out the scheme to defraud were the following:

   a. Soliciting merchants involved in prohibited and High Risk Transactions to seek payment card processing through Allied Wallet;

   b. Establishing "Sham Merchants"—non-existent businesses that purported to sell home décor, kitchen supplies, musical instruments, and other retail products with low risk of chargebacks and fraud—and applying for payment processing from Acquirers and Service Providers in the Sham Merchants' names for payment card processing through Allied Wallet, without disclosing that the true merchant clients were involved in prohibited and High Risk Transactions;

c.       Creating fake websites ("Transaction Laundering Websites") through which the Sham Merchants purported to sell retail products.   Transaction Laundering Websites typically did not process transactions but existed only to conceal the true merchants' prohibited and High Risk Transactions from the Card Brands, Acquirers, and Service Providers during their account opening, transaction monitoring, and compliance investigations;

d.       Incorporating shell companies, most often in the United Kingdom ("Shell Companies").   The Shell Companies used nominee directors, rented mailing addresses shared by hundreds of other Shell Companies, and generic names that backstopped the Sham Merchants' names on the merchant applications and Transaction Laundering Websites, all to conceal the true merchants' identities, locations, products, and services from the Card Brands, Acquirers, and Service Providers during their account opening, transaction monitoring, and compliance investigations;

e.       Selecting Billing Descriptors that corresponded to the names of the Sham Merchants and concealed that the true merchants were engaged in prohibited and High Risk Transactions ("Deceptive Billing Descriptors");

f.       Selecting MCCs for the Sham Merchants that corresponded to retail businesses, such as 5399 (miscellaneous general merchandise), to conceal that the true merchants were engaged in prohibited or High Risk Transactions ("False MCCs");

g.       Avoiding the payment of higher fees that certain Card Brands, Acquirers and Service Providers charged for High Risk Transactions;

h.       Listing customer service phone numbers in the Deceptive Billing Descriptors that did not belong to the true merchants, but instead to a call center that defendant

8

WELLS controlled.    If Issuers, Acquirers, or Service Providers called regarding a consumer chargeback or fraud allegation, the coconspirators instructed the call center operators not to reveal that the true merchant had engaged in a prohibited or High Risk Transaction;

      i.     Transferring processing for prohibited and High Risk Transactions into other Sham Merchant accounts, thereby misidentifying the parties involved in the transaction and subverting the monitoring and compliance programs of the Card Brands, Acquirers, and Service Providers ("Aggregation");

      j.     Distributing processing volume for a single merchant's prohibited and High Risk Transactions across multiple MIDs, both to avoid chargeback and transaction volume thresholds that would trigger potential fines from the Card Brands and to subvert the monitoring and compliance programs of the Card Brands, Acquirers, and Service Providers ("Load Balancing");

      k.     When Card Brands, Acquirers, and Service Providers learned that the Sham Merchants were actually engaged in prohibited or High Risk Transactions and requested that the Sham Merchants be terminated, knowingly misrepresenting that the Sham Merchants were not involved in such transactions;

      l.     Applying for and obtaining processing on behalf of terminated merchants using new Sham Merchants, Shell Companies, Transaction Laundering Websites, Deceptive Billing Descriptors, and False MCCs, without disclosing to the Card Brands, Acquirers, and Service Providers that the merchants had previously been terminated, thereby intentionally evading the Card Brand Rules designed to keep terminated merchants off of the Card Brand Networks; and

m.      Taking indicators of fraud and prohibited transactions that Card Brands, Acquirers, and Service Providers sent to Allied Wallet and using that information to improve the scheme's Transaction Laundering Websites and False Billing Descriptors, making Allied Wallet's true merchant clients less likely to be identified and terminated in the future.

## Acts in Furtherance of the Wire Fraud Conspiracy

28.      From in or about 2012 through in or about April 2018, KHAWAJA, DIAB, ROUNTREE, WELLS, Reseller 1, and other coconspirators known and unknown to the grand jury committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

*Merchants Brought to Allied Wallet by WELLS*

Payday Lending/Debt Collection

29.      On or about July 20, 2015, ROUNTREE emailed WELLS confirming Allied Wallet's activation of a merchant processing account for the Sham Merchant Stark Associates Ltd. ("Stark Ltd").   Stark Ltd was incorporated in the United Kingdom and purported to sell retail goods over the Transaction Laundering Website www.jvalances.com, but it was in fact a front for an Illinois-based debt collector, Stark Law, LLC d/b/a Stark Recovery.

30.      On or about October 15, 2015, a victim in Massachusetts gave her debit card number over the telephone to a caller threatening her with legal action, including arrest, if she did not pay a purported debt, which resulted in a fraudulent $890 charge on her bank statement identified by the billing descriptor "STARK 8445641074."

31.     On or about November 9, 2015, shortly after Payvision alerted DIAB and

ROUNTREE that Stark Ltd. was suspected of transaction laundering, WELLS emailed DIAB:

"Need some help, we closed the Stark account due to bank's viewing the web site etc. we reset

them up with another account."

32.     On or about November 12, 2015, WELLS emailed DIAB that Stark had "never

stopped processing" because after the Stark Ltd. Sham Merchant account was terminated,

WELLS continued processing Stark's transactions through another Sham Merchant's MID.    In

response, DIAB caused Allied Wallet to release payment to Stark Ltd.

33.     On or about February 2, 2016, after Payvision questioned Allied Wallet about

several Transaction Laundering Websites that the coconspirators were using to disguise payday

lending transactions, DIAB emailed WELLS and ROUNTREE:

> We've been doing this a long time and now the bank is questioning
> all the accounts and shutting them down with fines coming.  We
> cannot do this anymore, all the numbers are to loan companies who
> should know better by know [sic] and they need dedicated numbers.
> We cannot accept any more of these accounts unless everything is
> done correctly.  We cannot afford to lose a bank because of
> mistakes.  The below will be terminated immediately and fines will
> be issued for each one.  This is not good news because the bank has
> caught too many accounts now.

34.     On or about June 10, 2016, WELLS emailed DIAB and ROUNTREE that

customer service phone numbers for Sham Merchants would be answered by Priority Payout

employees, who would be under instructions not to disclose that the transactions were loan

repayments, adding:   "This is away [sic] to prevent calls being answered as before which lead

to accounts being closed by the bank."

35.     On or about July 12, 2017, WELLS emailed an independent sales agent on behalf of a payday lending merchant, Big Picture Loans, regarding a customer service number that was to appear on a Transaction Laundering Website purporting to sell picture frames:   "WE Can't use Big Pictures 800 number, google search clearly ties it to PAY DAY LOANS, see if they have another number that is sanitized."

Online Gambling

36.     On or about October 8, 2012, after Wirecard instructed Allied Wallet to terminate a Sham Merchant purporting to sell phone cards but that Wirecard suspected of being a front for online gambling, DIAB emailed Allied Wallet's fake "due diligence" for the Sham Merchant to Wirecard, promising to terminate all phone card merchants.   In a response only to DIAB, KHAWAJA wrote:   "Good one :)".

37.     On or about October 8, 2012, on the same day that Wirecard instructed Allied Wallet to terminate a Sham Merchant, DIAB emailed WELLS and KHAWAJA requesting a new Transaction Laundering Website for a new Sham Merchant:   "Hey Tom, Per your conversation with [KHAWAJA], we are still waiting on the new account details and the new URL, we need this a.s.a.p. we are running out of time."

38.     On or about December 25, 2012, after an Acquirer terminated two Sham Merchant accounts that were fronts for a WELLS gambling merchant, KHAWAJA emailed WELLS, copying DIAB, and directed him to immediately create two new Transaction Laundering Websites for the gambling merchant.

39.     On or about December 27, 2013, after WELLS provided DIAB and ROUNTREE with proposed Transaction Laundering Websites for several Sham Merchants, ROUNTREE emailed DIAB that WELLS "might want to start creating these sites at different companies.   All these sites are so similar and all designed by the same [website design company].   The bank isn't that stupid."

40.     On or about May 8, 2014, ROUNTREE emailed WELLS after an Acquirer had linked a Transaction Laundering Website to online gambling:   "I need a different website, descriptor and company from you" to allow processing to continue.

41.     On or about November 21, 2014, after an Acquirer requested termination of a Sham Merchant, DIAB emailed WELLS:   "Tom, We have to terminate pp brazil 9 for fraud, can you move volume to [pp brazil] 8 please I'll need to terminate in a few hours.   And send us 2 more accounts."

Prescription Drugs/Controlled Substances

42.     On or about November 29, 2016, after a Wirecard representative stated that Wirecard would be reluctant to onboard a Sham Merchant purporting to sell "Green Tea Facewash" for $543 per bottle, RINGLER sent Wirecard's comments to WELLS:   "Tom – See the bank's review and this is the less uptight bank.   Please fix."

43.     On or about December 1, 2016, Allied Wallet obtained processing from Wirecard on behalf of the same Sham Merchant using the Transaction Laundering Website www.skinnbeauty.net and the billing descriptor "ALW*skinnbeauty8552781810UK".

44.     On or about January 31, 2017, in the District of Massachusetts, an undercover federal agent purchased prescription drugs, without submitting a prescription, through the

13

website www.cheapscrips.com.    The false billing descriptor

"ALW*skinnbeauty8552781810UK" appeared on the agent's credit card statement.

*Online Gambling Processing Brought to Allied Wallet by Reseller 1*

45.     On or about July 15, 2015, after Payvision alerted DIAB and RINGLER that

www.pinheaven.com, a site purporting to sell gift cards, was possibly a front for prohibited

gambling, DIAB falsely responded "[t]his is not gaming" and threatened to pull Allied Wallet's

merchants from Payvision because "it's getting very difficult to work with the new team you

have."

46.     On or about July 24, 2015, Reseller 1 emailed DIAB a link for a Transaction

Laundering Website that would replace www.pinheaven.com:    http://mygifts247.com.    DIAB

responded:    "Anything other than gift cards please . . . It's a giveaway when they see that

Sell handmade jewelry 😊."

47.     On or about October 9, 2015, KHAWAJA emailed DIAB and Reseller 1

regarding a gambling merchant seeking payment card processing in Norway:    "Get this account

live for them today . . . Guys make sure the descriptor has no association with the you know

what."

48.     On or about October 27, 2015, in response to ROUNTREE's request for details

regarding a new Sham Merchant and Transaction Laundering Website that would replace the

terminated http://mygifts247.com, Reseller 1 emailed ROUNTREE, copying DIAB:    "It's us!

This will be the new mygifts247 same same but different 😊"

49.     On or about January 5, 2017, after Payvision alerted Allied Wallet that it

suspected a retail jewelry merchant of being a front for online gambling in Turkey and Japan,

ROUNTREE shared Payvision's suspicions verbatim with Reseller 1, DIAB, and others, and counseled them to create a new Transaction Laundering Website "with a business that makes sense for the number of times customers are being charged as well as avoiding all other concerns the bank is having . . . That is why we gave you all the bank's comments.   We don't normally do that.   Take their notes, come up with another website that will fit better."

### Overview of the Bank Fraud Conspiracy

50.     DIAB, ROUNTREE, Dekermenjian, representatives of Merchant Client 1, and coconspirators known and unknown to the grand jury agreed to engage in a scheme to obtain money in Fifth Third Bank's custody and control by fraudulently inducing Vantiv to provide payment processing services to Merchant Client 1, by knowingly misrepresenting its true identity and the High Risk Transactions it was processing.

### Object and Purpose of the Bank Fraud Conspiracy

51.     The object of the conspiracy was to commit bank fraud.   The principal purposes of the conspiracy included, among others, the following:

a.     To obtain payment processing services for Merchant Client 1 that Vantiv had refused to provide, including the settlement of payment card transactions out of Vantiv's account at Fifth Third Bank; and

b.     To obtain money, in the form of commissions earned based on the total value of payment card transactions processed and other fees.

### Manner and Means of the Bank Fraud Conspiracy

52.     Among the manner and means by which DIAB, ROUNTREE, Dekermenjian, representatives of Merchant Client 1, and coconspirators known and unknown to the grand jury

carried out the scheme to defraud were the following:

        a.      Soliciting Merchant Client 1, a merchant involved in High Risk Transactions, to seek payment processing services through Allied Wallet with Vantiv serving as an Acquirer.

        b.      Submitting records to Vantiv that omitted any reference to Merchant Client 1 being involved in High Risk Transactions;

        c.      After Vantiv learned that Merchant Client 1 was involved in High Risk Transactions and refused to process its transactions because of the risks involved, establishing two Sham Merchants—Natural Nine Online and True Count Student—both of which purported to sell consumer goods online;

        d.      Using Transaction Laundering Websites, Deceptive Billing Descriptors, and False MCCs to create the impression that the Sham Merchants were selling retail products online; and

        e.      Submitting millions of dollars in payment processing transactions through Vantiv that caused Vantiv to release payment to Allied Wallet from its merchant processing account at Fifth Third Bank.

## Acts in Furtherance of the Bank Fraud Conspiracy

53.      From in or about May 2017, through in or about January 2018, DIAB, ROUNTREE, Dekermenjian, representatives of Merchant Client 1, and other coconspirators known and unknown to the grand jury committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

        a.      On or about May 23, 2017, after Fifth Third Bank requested in connection

with its compliance efforts that Merchant Client 1 submit a business plan describing its

operations, DIAB directed Merchant Client 1 to omit from the business plan any reference to its

involvement in the student loan debt reduction business.

   b.  In early June 2017, after Fifth Third Bank rejected Merchant Client 1 for

engaging in prohibited High Risk Transactions, DIAB directed Merchant Client 1 to prepare

false applications for payment processing in the name of two Sham Merchants that purported to

sell consumer goods online.

   c.  On or about June 15, 2017, Merchant Client 1 emailed DIAB,

ROUNTREE, and others a link to a new Transaction Laundering Website that purported to sell

handbags.

   d.  On or about June 15, 2017, in response to Merchant Client 1's request to

keep a reference to "student" in the URL for the Transaction Laundering Website, DIAB replied

to Merchant Client 1 and ROUNTREE, among others:   "This is not ok!   Please change.   I

can't risk my bank."

   e.  On or about June 30, 2017, ROUNTREE caused a MID and False MCC

associated with a Sham Merchant to be provided to Vantiv so that Merchant Client 1 could begin

to process student loan debt reduction transactions.

   f.  On or about August 18, 2017, in an email with Dekermenjian regarding

how much to charge Merchant Client 1, DIAB stated:   "You must remember, they cant find

homes, that's why they need us.   so sell them high and make money."

17

<u>COUNT 1</u>
Conspiracy to Commit Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

54.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 53(f) of this Indictment.

55.     From in or about 2012, and continuing through at least April 2018, in the District of Massachusetts and elsewhere, the defendants

1.  AHMAD "ANDY" KHAWAJA,
2.  MOHAMMED "MOE" DIAB,
3.  AMY ROUNTREE, and
4.  THOMAS WELLS

conspired with Reseller 1 and others known and unknown to the grand jury to commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

18

COUNT 2
Conspiracy to Commit Bank Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

56.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 53(f) of this Indictment.

57.     Between in or about May 2017 and in or about January 2018, in the District of Massachusetts and elsewhere, the defendants,

(2) MOHAMMED "MOE" DIAB and
(3) AMY ROUNTREE

conspired with Dekermenjian, representatives of Merchant Client 1, and others known and unknown to the grand jury to commit bank fraud, that is, to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of Fifth Third Bank, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

58.     Upon conviction of one or more of the offenses in violation of Title 18, United

States Code, Section 1349, set forth in Counts One and Two, the defendants,

        (1)    AHMAD "ANDY" KHAWAJA,
        (2)    MOHAMMED "MOE" DIAB,
        (3)    AMY ROUNTREE, and
        (4)    THOMAS WELLS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C)

and Title 28, United States Code, Section 2461(c), any property constituting, or derived from,

proceeds obtained directly or indirectly, as a result of such offenses.

59.     If any of the property described in Paragraphs 58 above as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendants—

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without
       difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c)

Title 18, United States Code, incorporating Title 21, United States Code, Section 853(p), to seek

forfeiture of any other property of the defendants up to the value of the property described in

Paragraphs 58 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

                                        A TRUE BILL


                                        FOREPERSON



SETH B. KOSTO
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS


DEBORAH L. CONNOR
Chief, Money Laundering & Asset Recovery Section


J. RANDALL WARDEN
TRIAL ATTORNEY
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
MONEY LAUNDERING AND ASSET RECOVERY SECTION


District of Massachusetts: August 25, 2021
Returned into the District Court by the Grand Jurors and filed.


                                        /s/ Dawn M. King 1:12pm
                                        DEPUTY CLERK



21